12-1340, ALCON RESEARCH Ltd. v. BARR LABORATORIES, Inc., Mr. Perlman. Good morning, Your Honors. May it please the Court. The claims in this case require increasing the chemical stability of a prostaglandin by adding polyethoxylated castor oil to the composition. They do not require any particular magnitude of increase, nor do they require that the prostaglandin achieve any particular level of chemical stability. And there is no dispute that the process of physically adding polyethoxylated castor oil to a prostaglandin composition would be routine and well within the skill of the person of ordinary skill. Mr. Perlman, it seems to me your problem is the claim that you or your client drafted. If it had said just enhancing the stability, that would have been one thing, but it specified chemical stability. And as I see it, it's not clear that you proved that chemical stability of the accused product has been shown. I agree with you. The claim requires an enhancement of chemical stability. As to the infringement issue, which I think is what you are getting at, our view is the District Court erred in his discounting of our expert's testimony on the subject because of a requirement for a degree of expertise specific to prostaglandin chemistry that would not be required. As to the validity issues that we raise, under enablement and written description, of course, it's not our burden to prove in the patent that the invention worked. It's simply our burden in the patent to provide a sufficient disclosure to allow the person of ordinary skill to make and use the invention without under-experimentation and to describe the invention such as to demonstrate possession. And both of those are satisfied. Sitting back to infringement again, you've got an ANDA applicant who says not only invalid, but I'm not infringing. And therefore, you look to the claim and the claim says chemical stability and it was more than just the expert's so-called lack of prostaglandin experience. It was a failure of proof. That is certainly the District Court's finding. And our view on appeal is that those findings were infected by his error as to the qualifications. And let me give a little context to why I say that because I understand the road that I am on arguing clear error on the infringement finding. So let me explain why I think the clear error here matters. It was undisputed at trial that the sample that was tested that had the polyethoxylated castor oil, the same amount that's in Barr's product, there was less prostaglandin lost over time than in the sample without polyethoxylated castor oil. All agree to that. And that is a real loss. Both sides' experts agreed to that. And the question was, had we shown that at least part of that was due to the polyethoxylated castor oil increasing the chemical stability of the prostaglandin or was the entirety of that loss due to physical instability? And in this case, because the testing was done in glass containers, the physical instability that we're talking about here is adsorption with a D as in David, where the prostaglandin molecules will stick to the side of the container. And I'll contrast that with absorption with B as in Boy, where molecules, for instance, in plastic containers can absorb into the container as opposed to sticking to the surface of the container. And the testimony from Dr. Levinson and also from the inventor, Mr. Schneider, and it was not refuted by Dr. Kent. Dr. Kent simply said he wasn't aware that it was true, was that in glass, molecules do not absorb into the glass. They do adsorb to the side of the glass, but this phenomenon, when it happens, happens relatively rapidly. There was testimony it happens in hours or days, but certainly by the end of the first week, an equilibrium is reached. And however many molecules are going to adsorb to the wall of the container will have done it. And after that point, you will not get further adsorption. Because the testing was done in glass, you're also not going to get adsorption. And what Dr. Levinson essentially implied was a process of elimination approach. And said if it can't be adsorption into the glass because things don't absorb into glass and adsorption stops after a week at the latest, it must be prevention of chemical degradation. Now we're talking here, just to make sure we're on the same page, we're talking about the Table 7 solubility study. And the district court went through several steps of explaining why that solubility study, as the district court saw it at least, was not applicable, not a fair surrogate for the accused. But why is it simply easy to say that notwithstanding the difference in the BAC, notwithstanding experimental error, each of the points that the district court went through to say why that test doesn't really mirror the accused product, why is it something that we can say that's clear error? I find that really challenging. No, I understand that. And by the way, the reliance, as I read the opinion, the reliance on the lack of expertise of the witness was a fifth or sixth factor after the district court had gone through all the problems with the solubility test. Well, and I do agree with you that he said it at the end in terms of order. But I do think it's important to remember the context of how this trial went. I mean, this is not a subject that is within the understanding of the ordinary layman, certainly not something they teach in law school. And what we had was basically a battle of the experts on those very points that Judge Bryson has raised. And of course, district court is not required to agree with my experts. But what he can't do is dismiss my experts' understanding of the scientific principles on an improper and clearly erroneous basis. And I think if you look at it, Your Honor, what he did was he assessed, well, Dr. Levinson addressed each of the points that Judge Bryson, that you've raised at the district court address. And he said, I don't agree with Dr. Levinson. And he's not required to. But what he can't do is say, I don't agree with Dr. Levinson because he doesn't have a level of expertise that is in fact not relevant to the questions that Dr. Levinson is answering. So what we think is appropriate is, and we're not asking for an outright reversal, we're asking for you to correct that error in the district court's understanding, send it back to him and say, this level of expertise in this particular narrow area of prostaglandin chemistry was not necessary. So it shouldn't have undermined your faith. And reweigh the evidence. You're focusing, I think the only portion of the opinion that addresses this is that 821 paragraph 23, right, of the district court. That's correct. There are two sentences in which the court says in the first sentence, we note that Dr. Levinson admitted numerous times he's not an expert in prostaglandin chemistry or chemical changes in prostaglandin. To some extent, the court adds, this undermines our faith in his ability to reliably assess whether or not the picoin-barzanda product chemically stabilizes trebupros. Period. End of discussion. To some extent. It doesn't sound like this is the principal plank in the court's analysis of the infringement issue. But it's certainly significant enough that in a relatively short section he felt compelled to bring it up, and he felt compelled to bring up that it in fact undermines his faith. We don't say it undermines it completely, but he says to some extent it undermines his faith in Dr. Levinson's ability. We think that was an erroneous basis to undermine Dr. Levinson's reliability, and our burden here is only by more likely than not. And the district court erred in discounting Dr. Levinson's view on this basis. If he were to reweigh the evidence, given the burden of proof upon us, he might well come to a different conclusion. If he doesn't, I'm not saying he's compelled to agree with me, but I do think he is required to do an analysis if he's going to articulate a reason for discounting one side that isn't clearly erroneous. Now I would like... Could I question you about the validity issue? Absolutely. You had started to talk about the claim language and to follow up on Judge Lurie's question, chemical stability versus physical stability. That your... Let me ask the question this way. Is there anything in your view in the district court's findings that suggest that this claim is in fact has been shown to be inoperative with respect to chemical stability? The court does say that in the infringement section, very critical of some of the conclusions that the inventor reached with respect to chemical stability versus physical. But is there anything that the district court, in which the district court is saying there are inoperative embodiments with respect to chemical stability? He made no such finding that there were any inoperative embodiments. He made no finding that if one simply took the patent and followed its disclosure and used any amount of polyethoxylated castor oil described by the patent with any propaganda described in the patent and simply poured it in and stirred it appropriately, you wouldn't get some enhancement of chemical stability. And that flaw underlies his enablement analysis and his written description analysis. And I will say, in fact, Your Honor, that the district judge himself pointed out that some might perceive a tension in his ruling on infringement and his ruling on... It was in the anticipation section, right? This is at page 8, that's correct, at 845, 845 and 846. I think he made a critical point there that he found on infringement that we had not met our burden of showing that chemical stability was enhanced in the accused product. But on invalidity, it was Barr's burden by clearing convincing evidence to convince him that the claims were invalid, in the particular court I'm speaking of, that the inventor hadn't really invented something that chemically stabilized. And he said Barr failed to meet that burden. Barr failed to meet that burden. And so he made no finding, in fact, he made the opposite finding, that there's anything inoperative about anything within the scope of our claim. I see I'm in my rebuttal time. I'd like to reserve... Are there any more questions for Mr. Perlman at the moment? No. All right. We'll save your rebuttal time, Mr. Perlman. We'll stay from the other side. Mr. Ferranti. Thank you, Your Honor. May it please the Court. Let me start with the credibility issue. As counsel reaffirmed today in front of Your Honors, and also in their brief, their case for reversal on the non-infringement ruling boils down entirely to this issue of credibility. And they aren't even seeking reversal, they're just seeking vacature. And as you pointed out, Your Honor, the district court's assessment of Dr. Levinson's credibility was not at all a dispositive issue. This is what I don't understand. There's no issue in the cases. I understand it in terms of what happens to the prostaglandin in the presence of this additive. Was there? When the Court complained that Dr. Levinson wasn't an expert on prostaglandins, wasn't just entirely what remained in terms of efficacy? I'm not sure I completely follow your question, Your Honor. You're talking about credibility. You raised the question of credibility. The central issue... And I'm interested as to what was believed incredible. I'm not sure that credibility is even the right way to look at this. It's more a matter of persuasiveness. And the Court addresses this not only at A21, but also in the ruling on post-judgment motions, A60-61. And the issue where Dr. Levinson isn't as persuasive as Farr's expert, Dr. Kent, is with respect to chemical stability. Now, the issue here truly is one of prostaglandin chemistry. What Alcon decided to do in making its infringement case was rely on this single table in a study that was designed to and reported data with respect only to solubility and packaging issues, that is, physical stability issues, not chemical stability issues. So the concern is that Dr. Levinson is trying to extrapolate or read between the lines in this data to find chemical stability. And then the further concern is that he's trying to make a leap from the data reported in Table 7 to bars and a product, which differs in several material respects, respects that Alcon's own studies reported impacted chemical stability. And Dr. Kent, our expert, also reaffirmed these differences between the products, the compositions in Table 7 and bars and a product, go to chemical stability. Now, I think one thing I'd like to highlight is that Dr. Levinson himself, he repeatedly punted on questions involving chemical stability by saying that he's not an expert in prostaglandin chemistry or chemical changes in prostaglandins. There's no question... That's why I asked you what the issue was in terms of chemical change. Whether, in fact, there was evidence as to what kinds of chemical change occur or was it, as I had understood, it's just that the product remains in its initial form, in its effectiveness. Well, that's exactly the issue, Your Honor, is that the product remains in its original form. Chemical stability, of course, is about degeneration in the molecules. So degeneration in the molecules will produce degeneration products. The problem is that for Alcon... So was there evidence on your side  Yes, there was. Chemically? How it changes? The polyethoxylated castor oil, the PECO, did not improve the chemical stability. Rather, there's multiple different explanations for where this missing trabel frost went. It could have been adsorbed to the side of the container. It could have been precipitated. It could just be a matter of experimental error. Recall, we're talking about a tiny difference between these two samples in Table 7. We're also talking about a tiny amount of the travel frost. It doesn't take much to explain the difference in results. Mr. Ferranti, I'd like to ask you about the 1.12 issue. Yes, Your Honor. It seems to me there are a whole list of prostaglandins here. And there's a pretty good dosage description. This suggests to me that this is a fairly standard disclosure meeting 1.12. When you have a generic claim and you've got a lot of species, a lot of species disclosed, and a lot of how to use, a lot of dosage material, why wasn't the district court off base there? The basic problem with the invention of the specification here, Your Honor, is that the person of ordinary skill in the art cannot just make it and be done. You make it, or you try to make it. You think maybe you made it, and then you have to experiment to test. The problem is the art in this area is unpredictable. You cannot extrapolate. That's true in all pharmaceutical chemistry. It's unpredictable, but there's no undue experiment in picking and choosing and varying dosages. What you would need to do, as the district court construed the claims, it's just a matter of does the PICO increase the chemical stability at all. What you would need to do is experiment to check, first of all, is your prostaglandin very stable, because you can't rely on the data in the patent to assume that, because compound two doesn't tell you anything about any of the other prostaglandins within the scope of the patent. Then you have to determine is the stability, assuming you find any, is that chemical or physical? We can see from the development of Alcon's own internal development of the Travelcross product, this takes some work. You have to identify the degradation products, to run these different kinds of studies, and figure out, assuming you find any degradation products in the first place, is this actually chemical or physically stabilizing? The results of these experiments, again, are not going to be predictable from one prostaglandin to the other. You say that, but what is it? You have the burden of proving, by clear and convincing evidence, that this was not enabled. But it seems to me that first step in your analysis has to be that this is an unpredictable art, which is another way of saying that not all combinations of prostaglandins and PICO are going to produce chemical stability, right? But as far as I can see, you never introduced evidence that that was true, that there are inoperative embodiments in effect. This is a very broad claim, but it's then incumbent upon you, bearing the burden of proof, it seems to me, to show that, in fact, some embodiments simply aren't operative. I have two answers, or two sets of answers to that, Your Honor. First, that there is such evidence, and second, that that's not our burden with respect to name one. I'm interested in both of them. Let me start with the evidence that this won't just work. Dr. Levinson himself conceded there is no way you can tell by looking at a prostaglandin whether it is going to be of a type that will undergo hydrolytic degradation or whether it won't. Hydrolytic degradation being the specific type of chemical instability that PECO is supposed to help with. That's at A5669. Dr. Kent also called out the difference between unsaturated prostaglandins being more reactive than saturated. That's at A5858. And Dr. Kent testified that the scope of the patent is particularly problematic with respect to different types of prostaglandins. Type E and type I2 prostaglandins are unstable. They're known in the art to be chemically unstable. F2-alpha prostaglandins, like the travel prostate issue with bars in the product, but that has a class. F2-alpha prostaglandins are perfectly stable at the proper pH. So you would have problems with practicing the invention with optimal pH with respect to this whole class of prostaglandins. It seems to me, though, and it did seem to me that most of Dr. Kent's testimony went to optimization rather than whether there's any increase in chemical stability at all. Are you saying that he is saying that there are some combinations of prostaglandin and PECO as to which there is simply no increase in stability? I don't know if I put it quite that strongly, Your Honor, but he comes awfully close to that. At A5874 he says if you do not have the prostaglandin it will not be stable, you will not have a product. And this is part of the discussion about whether PECO is stabilizing for these certain types. And the flip is that if you have it at the optimal pH you have stability. So he is saying pH is dispositive. It's not just a matter of optimization. There's also evidence, of course, with bars in the product and the flip side with the brand product itself, Travitam Z, that the PECO isn't actually Travitam's own product. It's not clear. It's practicing its own invention. Now, the castor oil patents aren't even listed in the Ordinance. Mr. Ferrante, did the District Court call that there was evidence that a number of prostaglandins listed here could not be stabilized with PECO or simply that there wasn't proof that the ANDA applicant was using this invention and that the PECO was using this invention to chemically stabilize the prostaglandin, which was the subject of the NDA? He most certainly held your honor in the non-infringement section. In other words, there's a difference between failure of proof or infringement with respect to this product and invalidating the claim by showing, and I'm not sure it was shown, that a lot of these prostaglandins didn't work. Right. I do not think the District Court held that there are inoperative... He did not make a finding that these certain prostaglandins cannot be stabilized by PECO. What he found is that you can't tell. He incorporated what he called the chemical versus physical stability conundrum analysis from the non-infringement section. So wouldn't this holding send a bullet through to a pharmaceutical claim? I don't think so, your honor. I think this is an incredibly broad claim. But the breadth is shown by the fullness of the disclosure, the listing of all the prostaglandins. The fullness of the disclosure reinforces the breadth of what's claimed, but there isn't information to show that it will actually work. That is, a person of ordinary skill cannot pick this up and just practice it. You can't assume that the data that we have with respect to compound 2, even if it's chemical stability data at all. And the inventor himself conceded that a person of ordinary skill looking at this data might think it's physical stability data. But you do acknowledge that it's your burden to show that it doesn't work from the full breadth of the claim, correct? We do not acknowledge that, your honor. This is the second part. I don't think we need to show that the invention doesn't work. What we need to show is that there will be undue experimentation to make and practice the invention. The patent can't just be a starting point. That's always the case. It can't just be a proposition that the person of ordinary skill picks up and runs with or tries. It needs to be something that you can practice without experimenting. Let's suppose the science were clear. Nobody knew it, but it just so happened that it does work with every embodiment. Nobody proves that at trial. Are you saying that, notwithstanding that nobody proved whether it does or doesn't work with respect to every embodiment, nonetheless, there would have to have been a lot of experimentation to establish that it works for every embodiment. And that renders the claim invalid? Yes, your honor, it does. And I would recommend or direct your honor to the ALSA case and the Amgen case where we have these disclosures that are not commensurate with the scope of the claim. So in Amgen, for example, it was DNA sequences. And the claims covered an enormous number of DNA sequences. And what this court held is that they didn't disclose enough sequences in the patent to enable the enormous scope of the claim, given the unpredictability. Isn't that the key? It's the identification of whose burden it is to show that it is unpredictable, i.e., that it doesn't work in some instances. It's the i.e., I think, where I would respectfully disagree with your honor, that it doesn't work in some instances. The unpredictability is one of the wrong factors, of course. And by showing, which we did, but using that predicated on the conclusion that the reason you can't extrapolate from A to B is because there are some Bs that don't work. Otherwise, you couldn't extrapolate. And it would be your burden to prove that, right? Well, the patent itself actually discloses that there are some embodiments that probably wouldn't work. It warns against including too much PICO that would prevent scientific efficacy. So I think if we need to show that there are embodiments that don't work, I think there is some evidence of that in the record that would support that. But again, your honor, I think the purpose of the enablement requirement is to make sure that the disclosure is commensurate with what's claimed and that the person makes sure that you haven't destroyed the efficacy of your cross-appealing. Make sure that it's chemical stability and not physical stability. I haven't had an opportunity to address our cross-appeal. I would like to do that. I know we have a couple minutes at the end that we can talk about that. We'll give you one minute to tell us what the cross-appeal is. On the cross-appeal, your honor, the basic procedural facts are unspewed. We lay this out in the briefs, and that's enough. For all the back-and-forth about the precedents in the briefing and in the lower court's decision, the rule set by this court's precedents is actually very simple. It's when you put a claim into a case when it's clearly pleaded. If it is not clearly withdrawn before trial, the patentee's failure to introduce evidence of infringement means judgment for the challenger. Here, the first part of that test is that the challenger  who has the power because there were no motions to amend. There were no motions for voluntary dismissal all the way up to the case. These claims were never taken out of the case as the case went to trial. But you were told and agreed, were you not, that they were not in the case? No, your honor. We were told by a letter in August of 2010 after the pleadings had closed, after the district court had said no more amendments to the pleading, that Alcon would not be asserting infringement and would prepare and circulate for our approval a stipulation of dismissal with prejudice. And have those patents expired? Thank you for raising that, your honor. I should have pointed out at the outset one of the two has expired. Our cross-appeal involves the 383 and the 052 patents. The 383 since the close of briefing expired in August. And with respect to that, Alcon hasn't given this court any reason why we should have our judgment except that they want to maintain the blockade at FDA. What happened after this letter? It looks like to me that so far as the briefing tells us, that letter went out and then we hear nothing more from either party about what's going on with this dismissal with prejudice. Did you not reach an agreement with prejudice or what? My understanding, your honor, is that what happened after the letter went out. Two things. One is that we canceled all these depositions as Alcon requested in return for its promise to not assert these claims anymore. And drafts were exchanged but the parties didn't reach an agreement. So the effect of that sounds like to me that you weren't able to agree to an arrangement that would result in a dismissal where the estoppel issue comes in if you never really reach... There was an offer, in other words, to dismiss with prejudice and there was never any agreement that stemmed from that. The commitment that Alcon made was that they would not be asserting infringement and that we would reach agreement on a judgment. And again, most importantly, that they would not be asserting infringement of these patents. So they failed to get their claims back out of the case. Now you... All right, I think we understand the issue. Thank you. Thank you, Your Honor. Mr. Perlman. Let me... Let me start with the cross appeal and I'll just be brief on the cross appeal because I think the district court laid out in pretty good detail what was going on here. Everyone knew prior to trial that these claims were out of the case and the best evidence of that was the joint pretrial order filings and the defendants' own separate pretrial order filings. We cited all this in our brief. I'll just make three takeaway points from it. The defendants filed a pretrial order with us saying Alcon has dropped these claims from the case. In their own pretrial filings where they say this is the relief we request at trial and they list pages and pages of issues on which they want relief and they list nothing as to the 383 and 052 patents. And they expressly defined both in their own documents and in the joint documents the phrase patents in suit to include the other four patents and exclude these two patents. The district court was 100% correct that everyone through their conduct knew these claims had been and if nothing else were written consent to amendment of the pleadings and the district court was correct. But the term dropped is a really unfortunate term. Wouldn't you agree? Does that mean that we're not going to pursue it? Does it mean we are formally severing those claims out and could raise them later? It's really quite unhelpful to have language like that in the pretrial order. Well, one, I don't think it's so ambiguous but in the same pretrial order documents there's a footnote that says Alcon is not asserting these patents so that would be helpful. But you could either view that as those claims are not going to be aggressively pressed in the litigation i.e. we're consenting to judgment on those claims or you could say, well, we're trying to kind of informally dismiss the amount of complaints. I don't think there is any ambiguity on this because the offer we made was to stipulate the dismissal of the claims. We never offered an entry of judgment against ourselves on these claims. Well, dismissal of the claims would be in effect entry of judgment. It would be dismissal of the claim with prejudice and would preclude a subsequent suit. Well, it would preclude you presumably from asserting these claims as a basis for resisting your opposing parties and I would assume. No, no, I think there's a critical distinction here. There's a critical distinction. What the fight here is over is whether they can get an affirmative finding  A stipulation of dismissal or dismissal of prejudice does not give that. And the absence of a declaratory judgment claim, a counterclaim, seeking relief on the merits on the patent, they had no entitlement to that relief if the patentee doesn't wish to press forward with infringement claims. The only issue on a dismissal before a district court is is it going to be with prejudice, is it going to be without prejudice, will there be fees, will there be costs. But dismissal with prejudice and without prejudice is a very significant difference. It is a significant difference, but neither option allows, the patentee to go forward with a claim it doesn't want to go forward with in the absence of a counterclaim. And if the patentee doesn't wish to go forward, then that's just it. The claim is dismissed. If it has a collateral consequence on the patentee in a future case, that's for a future court. But what the issue in this case is is whether in this case, without ever having asserted an affirmative claim, bar having known full well we were not asserting our claim of patent infringement, is entitled to a judgment in their favor that that is our fundamental point. If I could make just my time is dwindling. If I could make a couple of short points. We have a couple of minutes on the merits of rebuttal. I appreciate that, Your Honor. On infringement, I think I said my piece in the opening argument and I do think it's reversible error, but I would say if Your Honors are inclined to disagree with me on that, you either need to reach the validity findings on the merits or you need to vacate the invalidity findings because an invalidity finding obviously has collateral consequences to us if an individual product infringes. I think it's reversible. I think you should vacate and send back the infringement. But if you don't, we'd have to either reach validity or vacate validity. On validity, the critical point, and I think Judge Bryson hit on it, is there was no evidence that there was any unpredictability as to whether there was going to be enhancement of chemical stability by adding polyethoxylated castor oil to the composition. The unpredictability goes to the magnitude of the enhancement and the resulting end result, the degree of final stability the product has. There is no evidence at all that any experimentation is required in order to achieve some enhancement. And there is no evidence in the record. You can look closely at the two pages farsighted in their brief and the one page that came up today in the argument. There is no evidence in the record that there is any configuration of perfect stability where there is no enhancement possible. It simply is not in the record. It was their burden of proof to show both that undue experimentation would be required when one picked up our patent specification, which is quite detailed and tells you what to do, that somehow you'd have to do some experimenting. It's also their burden to show that that fairly typical, I think Judge Lurie's correct disclosure, didn't describe the invention, which of course it does. They never proved those facts. It's their burden of those facts and the District Court's judgment of invalidity should be reversed. If there are no more questions, I thank the Court. Okay, any more questions? Okay, thank you Mr. Perlman and thank you Mr. Ferrari. The case is taken under submission. Well, all right. Okay, there was one minute. Thank you, Your Honor. I promise just a minute. On the cross-appeal, of course, focusing on that. It was Alcon's claim. They put it in the case and they did not take it out. The commitment in the letter was that something else was going to happen for them to take their claim out of the case, that Barr would agree to or have the opportunity to deal with it from the Court. The pretrial order cannot be read as a stipulation of dismissal or seeking amendment of the pleadings at this time. You cannot read that document as an amended pleading. It also says, what counsel highlighted, the drop and not asserting language. Both of those statements go to the patents. They don't refer to the claims. There is no way to read this order as the motion for amendment or the motion for withdrawal that was never filed. Could I ask just one very quick question? Could I ask counsel that there is a difference between a judgment in your favor on those two patents versus a dismissal of the claims with respect to those two patents with prejudice for purposes of our hatchback situation? I will say that we requested when we got up for the motion to make the motion of trial, we requested a judgment of non-infringement is something we have to take up with the FDA. We'd be more comfortable that we won't have a problem with FDA and its hatchbacks and exclusivity with the judgment of non-infringement. So if they had gone ahead with the agreement to dismiss with prejudice, you wouldn't necessarily be out of the woods with the FDA? Well, what they had promised was to get our agreement with the FDA. But it sounds like what you're saying is you're not sure you could have covered all your bases without actually getting a judgment from the court and your opposing counsel said that you absolutely would have had to get a judgment from the court. So I'm having a hard time seeing the prejudice that you've invoked with respect to the estoppel issue. What's where I'm going? Well, that's not going to happen. We would have an opportunity to work out the proper stipulated dismissal. And we never have that opportunity. Thank you very much. Good, thank you.